YACHT CARIBE CORP.,
et al., Plaintiffs,

v.

CARVER YACHT LLC,
et al., Defendants.

CIVIL NO. 15–2826 (GAG)

United States District Court,
D. Puerto Rico.

Signed August 23, 2017

Felix M. Roman–Carrasquillo, San Juan, PR, for Plaintiffs.

Jeffrey D. Smith, Honigman Miller Schwartz and Cohn LLP, Kalamazoo, MI, Luis A. Oliver–Fraticelli, Adsuar Muniz Goyco Seda & Perez Ochoa PSC, Melissa Hernandez–Carrasquillo, Saldana, Carvajal & Velez–Rive, P.S.C., San Juan, PR, for Defendants.

### OPINION AND ORDER

GUSTAVO A. GELPI, UNITED STATES DISTRICT JUDGE

Yacht Caribe Corp. and All Service Marine Inc. (collectively "Plaintiffs") filed the present diversity suit against Carver Yacht LLC and Marquis Yacht, LLC (collectively "Defendants"). Plaintiffs allege that Defendants violated the Puerto Rico Dealers Act, Act 75 of June 24, 1964, 10 P.R. Laws Ann. §§ 278–278d ("Law 75") by appointing a competitor as Marquis Yacht LLC's exclusive dealer in Puerto Rico and canceling the dealership agreement that allegedly existed between them. (See Docket No. 15, ¶¶ 26–28.) Plaintiffs also assert a breach of contract claim as well as a claim for a breach of implied duty of

good faith based on the dealership agreement. Id. ¶¶ 31–44.

Before the Court is Defendants' Motion for Summary Judgment seeking dismissal of all claims. (Docket No. 22.) As explained below, the Court **GRANTS in part** and **DENIES in part** Defendants' motion.

## I. Relevant Factual and Procedural Background

The Court states the facts in the light most favorable to Plaintiffs, the nonmovants. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Unless otherwise noted, the facts are not disputed by the parties for summary judgment purposes. See L. Cv. R. 56(e) (properly supported facts are deemed admitted for summary judgment, unless properly controverted).

In 2003, All Service Marine, Inc. ("ASM") entered into a dealership agreement with Genmar Yacht Group, LLC ("Genmar") to distribute boats under the trade names "Marquis Yachts" and "Carver Yachts" in Puerto Rico. (Defendants' Statement of Uncontested Material Facts, Docket No. 23, ¶¶ 2–3,6) (hereinafter "DSUMF") (Plaintiff's Opposing Statement of Material Facts, Docket No. 30, ¶ 1) (hereinafter "POSMF") (see also Docket No. 30–5, at 6.) In 2009, Genmar filed a bankruptcy petition and was eventually liquidated under the provisions of Chapter 7 of the United States Bankruptcy Code. (DSUMF ¶ 4; POSMF ¶ 4; see also Docket No. 23–2 at 3.) In 2010, during the liquidation, Defendants acquired Genmar's "Carvis and Marquis-branded assets." (Docket No. 23–2, at 2.)

Following the sale in early 2010, Defendants and ASM discussed the marketing and buying programs regarding the Marquis and Carver Yacht brands for the upcoming 2011 model year. (DSUMF ¶¶ 8–9; POSMF ¶¶ 3–4.) Each year thereafter, until ASM's closure in 2012, Defendants provided ASM with the buying program documents which set forth what would be required to be considered a Marquis dealer. (DSUMF ¶¶ 9A, 9B; POSMF ¶ 4.) Among the requirements stated in the documents, an aspiring dealer had to (1) sign and return a dealership agreement and (2) either stock or pre-sell a Marquis boat. (DSUMF ¶ 9B; POSMF ¶ 4.)

Between 2010 and 2012, ASM sold one Marquis Boat. (DSUMF ¶¶ 10–11; POSMF ¶ 5.) In 2012, ASM was closed due to losses associated with its servicing activities and Yacht Caribe Corp. ("YC") was formed with the intention of focusing on boat sales, although some of the warranty and servicing activities previously performed by ASM would still be performed by YC. (DSUMF ¶¶ 12–14; POSMF ¶¶ 7–8; see also Docket No. 30–5, at 7.) To this effect, all of ASM's parts and equipment, including those related to the Carver and Marquis brands, were transferred to YC. (POSMF ¶ 15.) YC also continued to offer the warranty services previously performed by ASM to owners of Defendants' brands. Id. YC applied to become Defendants' dealer in 2012. (DSUMF ¶ 18; POSMF ¶ 12.)

Although they never answered YC's application, Defendants provided YC with their product, marketing, and buying programs, in the same way as they had done with ASM. (DSUMF ¶ 20; POSMF ¶ 14.) Defendants also referred to YC as their dealer in Puerto Rico and passed all leads for sales in the area to YC. (POSMF ¶ 14.) From 2012 to 2014, YC was not able to sell any Marquis or Carver boats. (DSUMF ¶ 28; POSMF ¶ 28.) However, it still actively sought out sales leads, represented the brands at boat shows, and provided warranty services to owners of Defendants' brands during this time period. (POSMF ¶ 22.)

On May 2014, a potential customer informed YC that it no longer appeared as Defendants' dealer in their website. (Docket No. 30–5, at 52.) Plaintiffs eventually learned that Defendants had appointed another company as their exclusive distributor in Puerto Rico. (Docket No. 15 ¶ 28.) After Plaintiffs' repeated attempts to discuss the issue, on November 21, 2014, Defendants responded that ASM's dealership agreement with Genmar was extinguished after the latter's bankruptcy, and that Marquis, LLC had never formed a dealership agreement with YC. (Docket No. 17, at 2.)

Plaintiffs subsequently filed the present action, seeking redress for Defendants' unlawful termination of their dealership agreement under Law 75, as well for breach of contract and for breach of implied duty of good faith dealings under Puerto Rico law. (Docket No. 15, ¶¶ 23–44.)

Defendants move for summary judgment on all claims, arguing that (1) a dealership agreement was never established between the parties; (2) even if a dealership agreement had been established, there was just cause under Law 75 for its termination given that YC never sold a Marquis or Carver boat which, among other reasons, meant that it never met Defendants explicit dealership requirements, and (3) regardless, Plaintiffs have not suffered any damages as a result of Defendants' actions. (Docket No. 22.) Plaintiffs responded in opposition, claiming that genuine disputes of material fact as to whether a dealership agreement under Law 75 was reached between the parties given the extensive endeavors that they engaged in on behalf of Defendants' brands, and whether Defendants met their burden of showing just cause to terminate such agreement preclude the entry of summary judgment. (Docket No. 29.) Defendants timely replied, rejecting the theory advanced by Plaintiffs in their opposition that the original dealership agreement was novated to include favorable terms for YC based on Puerto Rico's "soft market" for boat sales. (Docket No. 35.)

## II. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (citations omitted). The movant bears the initial burden of demonstrating the lack of evidence to support the nonmovant's case. Celotex, 477 U.S. at 325, 106 S.Ct. 2548. Then, the burden shifts to the nonmovant, who must establish at least one genuine and material issue of fact. Maldonado–Denis v. Castillo–Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that the material cited by the movant "do[es] not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the Court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the Court must deny summary judgment. Liberty Lobby, 477 U.S. at 248, 106 S.Ct. 2505.

The Court views the evidence in the light most favorable to the nonmovant, resolving all reasonable inferences in that party's favor, without making any credibility determinations or weighing the evidence. Id. However, summary judgment is appropriate when the nonmovant's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Municipality of Mayagüez, 440 F.3d 17, 21 (1st Cir. 2006) (citation omitted).

## III. Discussion

■ The parties are diverse and the matter in controversy exceeds the required amount, so this Court has diversity jurisdiction to hear the parties' dispute. See 28 U.S.C. § 1332(a). State substantive law supplies the rules of decision for a federal court sitting in diversity jurisdiction, so Puerto Rico law applies here. Salvati v. Am. Ins. Co., 855 F.3d 40, 44 (1st Cir. 2017) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

### A. Unlawful termination of dealership agreement under Law 75

■ Law 75 provides that "no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause." P.R. Laws Ann. tit. 10, § 278a. It was enacted specifically to remedy the abusive practices of suppliers who arbitrarily eliminate distributors after they invest in the business and successfully establish a market in Puerto Rico for the supplier's product or service. Waterproofing Sys. v. Hydro–Stop, Inc., 440 F.3d 24, 28–29 (1st Cir. 2006) (citations and quote marks omitted). The statute establishes a rebuttable presumption that a principal or grantor has impaired the relationship when, among other actions, it "establishes a distribution relationship with one or more additional dealers for the area of Puerto Rico or any part of said area in conflict with the contract existing between the parties[.]" P.R. Laws Ann. tit. 10, § 278a–1.

### 1. Existence of a Dealership Agreement

■ Defendants' core argument for dismissal of all claims is that Marquis Yachts never signed a dealership agreement with YC, and that YC was merely a "friendly" broker. (Docket Nos. 22, at 2; 23 ¶ 20.) Law 75 defines a dealer's contract as the:

Relationship established between a dealer and a principal or grantor whereby *and irrespectively of the manner in which the parties may call, characterize or execute such relationship*, the former *actually and effectively takes charge of the distribution* of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico.

Id. § 278(b) (emphasis added). As this Court has previously held, how the parties refer to each other is inconsequential in determining whether a dealer's contract under Law 75 has been established. See Re-Ace, Inc. v. Wheeled Coach Industries, Inc., 343 F.Supp.2d 97, 100 (D.P.R. 2004). It is also irrelevant whether the relationship is "committed to writing", because a dealer's contract may be established irrespective of the way in which such relationship is executed. R.W. Int'l Corp. v. Welch Food, Inc., 13 F.3d 478, 483 (1st Cir. 1994); see also P.R. Laws Ann. tit. 10, § 278(b).

■ What matters in this analysis are the actual functions performed by the purported dealer on behalf of the principal or grantor. Re–Ace, 343 F.Supp.2d at 100. Specifically, courts must determine whether "the dealer actually and effectively [took] charge of the distribution" of the

principal's products. Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 4 (1st Cir. 1999) (internal quotation marks omitted) (citation omitted). The Puerto Rico Supreme Court has outlined a list of factors that courts must consider in order to make this determination, which the First Circuit has summarized as follows: (1) promotion and marketing of the product, (2) whether inventory was kept, (3) authority to fix or establish prices, (4) delivery and billing responsibilities, (5) authority to extend credit, (6) advertising campaigns, (7) assumption of risk, (8) purchasing the product, (9) maintaining facilities associated with the product, and (10) offering product-related services to customers. Id. at 4–5; see also San Juan Merc. v. Canadian Transp. Co., 8 P.R. Offic. Trans. 218, 220–21 (1978). Not all of these factors must be present and none carries more weight than the other when determining whether a dealer's contract has been established. Next Step Med. v. Bromedicon, 190 P.R. Dec. 474 (2014); see also Triangle Trading Co., 200 F.3d 1, 4.

■ Defendants rely heavily on the undisputed fact that YC never sold any of their boats as support for their argument that YC never "actually and effectively took charge of the distribution of Marquis' products as required for protection under Law 75." (Docket No. 22 at 8.) However, as discussed above, Defendants allude to only one of the factors that the Puerto Rico Supreme Court has set out for determining whether a dealer's contract exists between the parties. Indeed, Plaintiffs readily admit that YC was never able to sell any of Defendants' boats. (POSMF ¶ 22.)

In other words, lack of sales under Law 75 is not dispositive of the existence of a dealership agreement. San Juan Merc., 8 P.R. Offic. Trans. at 221–22. Plaintiffs instead point to some of the other factors that courts must consider in order to ascertain the existence of a dealer's contract between the parties. For example, Plaintiffs have presented evidence from which it may be inferred that YC engaged in extensive promotion of Defendants' products, persistently pursued sales leads and "made all efforts possible and invested a lot of money and time in the marketing, sales efforts and services to make sure that customers knew and learn about Marquis' products (both Carver Yachts and Marquis Yachts)." (POSMF ¶ 22.) In other words, Plaintiffs have presented evidence from it which may be inferred that they created a favorable market for Defendants' products in Puerto Rico.

Plaintiffs have established evidence supporting five of the factors relevant to determining whether a dealer "actually and affectively took charge" of distribution under Law 75. Plaintiffs also point to Defendants' continued practice of referring all potential customers in the Puerto Rico area to YC, as well as the fact that every year they would receive Defendants' buying programs and marketing materials, as signs that they were actually and effectively in charge of the distribution of Marquis LLC's products in the Puerto Rico market. (Docket No. 30–5 at 47.) Plaintiffs allude to Defendants' invitations for YC to represent their brands at several boat shows, and the potential sales leads that were obtained in said shows that were subsequently pursued by YC as further proof of the dealership relationship between them and Marquis, LLC. (POSMF ¶ 22.)

Although denied by Defendants, Plaintiffs have set forth evidence that they provided warranty and repair services to owners of Defendants' brands. (DSUMF ¶¶ 23–24; POSMF ¶¶ 17–18.) Finally, YC had authority to set prices as well as the responsibility to bill customers and deliver Defendants' products (see Docket No. 30–

5, at 39). Based on these factors, and making all reasonable inferences in favor of Plaintiff, the Court must conclude that there exist a genuine issue of material fact as to the existence of a dealer's contract—as defined by Law 75—between YC and Defendants for the distribution of the Marquis and Carver brands in Puerto Rico.

### 2. Just Cause

■ Given that the Court must assume the existence of a dealer's contract under Law 75 for summary judgment purposes, Defendants carry the burden of showing just cause for its termination. See R.W. Int'l Corp. v. Welch Foods, Inc., 88 F.3d 49, 51–52 (1st Cir. 1996). Just cause is defined by Law 75 as "[n]onperformance of any of the essential obligations of the dealer's contract, on the part of the dealer, or any action or omission on his part that adversely and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service." P.R. LAWS ANN. tit 10, § 278(d).

Defendants argue that "YC clearly understood that the sale of Marquis' boats was an essential obligation of any dealer contract or relationship, and that the failure to sell Marquis' boats adversely and substantially affected Marquis' interests." (Docket No. 22 at 8.) Plaintiffs have disputed this assertion, claiming that they fulfilled of their obligations as Defendants' distributors. (See POSMF ¶¶ 4, 13, 22.) Moreover, Defendants' use of the phrase "clearly *understood*" underscores the fact that the absence of a written dealer's agreement makes their burden of showing just cause significantly harder, as they are unable to point to any specific piece of evidence in support of their argument other than the undisputed fact that Marquis, LLC was in the business of selling boats. (DSUMF ¶ 27; POSMF ¶ 21.)

■ The fact that a principal or grantor is in the business of selling a product does not necessarily imply that the sale of such product in a given period is an essential obligation of any dealer's contract, especially one devoid of a specific agreement to that effect. In fact, Law 75 specifically addresses the issue of sales quotas and whether failure to meet them constitutes just cause:

> The violation or nonperformance by the dealer of any provision included in the dealer's contract fixing rules of conduct or *distribution quotas or goals because it does not adjust to the realities of the Puerto Rican market* at the time of the violation or nonperformance by the dealer shall not be deemed just cause. The burden of proof to show the reasonableness of the rule of conduct or of the quota or goal fixed shall rest on the principal or grantor.

P.R. LAWS ANN. tit. 10, § 278a–1(c) (emphasis added). Thus, even if the Court were to assume that the unwritten dealer's contract between the parties included an obligation to achieve a certain number of sales in a given period, Defendants have the burden of proving that said number of sales adjusts "to the realities of the Puerto Rican market at the time of the violation[.]" Id. To this end, Plaintiff has set forth evidence from which it may be reasonably inferred that YC's failure to close any sales of Defendants' boats was due to the serious downturn that the market for boats has experienced in Puerto Rico, consistent with the overall contraction of the Island's economy. (See Docket No. 30–5, at 23.)

Defendants, on the other hand, failed to address the reasonableness of their unwritten sales requirements and whether they adjusted to the realities of the Puerto Rican market during the time period in question. They have thus failed to meet

their burden of showing that no issue of material fact exists as to just cause for the unilateral termination of YC's dealership contract.

### 3. Damages

■ Defendants claim that YC has presented no evidence of having suffered any damages as a result of the termination of the parties' relationship, and thus their claims under Law 75 must fail as a matter of law. (Docket No. 22, at 11.) However, Plaintiffs have disputed this argument with evidence, as Gustavo Lectorá's deposition reveals that YC was about to close several Marquis or Carver boat sales before the potential customers found out that YC had been terminated as an authorized dealer of Defendants' brands and removed from their website as such. (DSUMF ¶ 26; POSMF ¶ 20.) As there remain substantial material facts under genuine dispute, Defendants' motion for summary judgment as to Plaintiffs' claims under Law 75 is **DENIED.**

### B. Breach of contract and implied duty of good faith

■ Although, for summary judgment purposes, the Court has found that there was a dealer's contract between the parties, as liberally defined by Law 75, this does not imply that an enforceable contract was formed according the Commerce and Civil Codes of Puerto Rico. The requirements for the formation of an enforceable contract under the Puerto Rico Civil and Commerce Codes are different than those established under Law 75 for the existence of a dealership relationship

between a principal or grantor and a dealer.[1]

■ Under Puerto Rico law, a claim for breach of contract has three elements: (1) a valid contract; (2) a breach by one of the parties to the contract; and (3) resulting damages. P.R. LAWS ANN. tit. 31, § 3018; Mega Media Holdings, Inc. v. Aerco Broad. Corp., 852 F.Supp.2d 189, 199–200 (D.P.R. 2012) (citations omitted); Unisys P.R., Inc. v. Ramallo Bros. Printing, Inc., 128 P.R. Dec. 842, P.R. Offic. Trans., 1991 WL 735351 (P.R. 1991). A valid contract under Puerto Rico law must have three elements: (1) consent of the contracting parties; (2) a definite object which may be the subject of contract; and (3) cause for the obligation that is being established. P.R. LAWS ANN. tit. 31, § 3391. The Puerto Rico Commerce Code imposes an additional requirement for the enforcement of commercial contracts whose amount exceeds three hundred dollars: the essential elements must be in written form or otherwise corroborated by non-verbal evidence. Id., tit. 10, § 1302; Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, 122 F.3d 88, 89 (1st Cir. 1997).

■ It is undisputed that a written dealership contract was never executed by the parties, as YC's dealership application was never returned by Defendants and they never explicitly offered a dealership agreement to YC. (DSUMF ¶¶ 18–19; POSMF ¶¶ 12–13.) It is further undisputed that YC never met the requirements established in Defendants buying programs to become a Marquis, LLC dealer. (DSUMF ¶ 19; POSMF ¶ 13; see also Docket No. 30–5, at 29–30, 51.)

---

1. See San Juan Merc., 8 P.R. Offic. Trans. at 221–22 (citing III–1 Garrigues, TRATADO DE DERECHO MERCANTIL 544 (1963) and Dr. Arturo Estrella, El Contrato de Agencia o Representación Comercial, 31 REV. C. ABO. P.R. 248, n.19 (1970)) ("[The indemnification provided by Law 75] is not an indemnification for the breach of a contractual obligation; *this would follow the regular norms for breach of contract.* Nor is it a compensation of a social nature, inspired in the wish to protect the worker as the economically weak party. It is rather a compensation for services actually rendered by the agent.") (emphasis added).

Plaintiffs have failed to set forth any evidence of Defendants' consent to enter into any contract, much less any written corroboration of a commercial contract. As a result, the Court must conclude that there is no enforceable contract between the parties. Since count II (breach of contract) and count III (breach of implied duty of good faith based on such contract) of the Complaint are and based on the existence of a contract between the parties (see Docket No. 15 ¶¶ 32–35, 42), Defendants' motion for summary judgment on both counts is **GRANTED**. The claims encompassed by counts II and III of the Complaint are **DISMISSED with prejudice.**

## IV. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment at Docket No. 22 is **DENIED in part** and **GRANTED in part**. Defendants' motion for summary judgment as to Plaintiff's Law 75 claim is **DENIED**. Plaintiffs' breach of contract and implied duty of good faith claims are hereby **DISMISSED with prejudice.**

**SO ORDERED.**